1              UNITED STATES DISTRICT COURT

2               DISTRICT OF CONNECTICUT

3    _____
     UNITED STATES OF AMERICA    )
4              Government    ) NO: 3:07cr11(JCH)
                             )
5    vs.                     ) May 26, 2009
                             ) 2:12  p.m.
6                            )
     SHAMERE McKENZIE        )
7              Defendant.    )
     _____
8                              915 Lafayette Boulevard
                               Bridgeport, Connecticut
9
                    SENTENCING HEARING
10
     B E F O R E:
11              THE HONORABLE JANET C. HALL, U.S.D.J.

12   A P P E A R A N C E S:

13

     For the Government  :    KRISHNA PATEL
14                            U.S. Attorney's Office
                              915 Lafayette Boulevard
15                            Bridgeport, CT  06604

16

17

     For the Defendant   :    DIANE POLAN
18                            Law Offices of Diane Polan, LLC
                              746 Chapel Street
19                            Suite 202
                              New Haven, CT 06510
20

21

22   Court Reporter      :      Terri Fidanza, RPR

23

24

25   Proceedings recorded by mechanical stenography,
     transcript produced by computer.

THE COURT:  We're here this afternoon in
the matter United States of America versus
Shamere McKenzie, case number 3:07cr11.  If I
can have your appearances please.

MS. PATEL:  Good afternoon, your Honor.
Krishna Patel and Michael Frank for the
government.

MS. POLAN:  Good afternoon, your Honor.
Diane Polan for the defendant who is standing
next to me.

THE COURT:  Good afternoon to both of you
as well.

We're here in connection with the
sentencing of Shamere McKenzie.  In that regard,
the first thing I would like to be sure of
Ms. McKenzie had an opportunity to read the
PreSentence Report including the addendum and
had the opportunity to review it with Attorney
Polan before today.

THE DEFENDANT:  Yes.

THE COURT:  There's a preliminary matter
that I want to take up, mainly due to the
availability of a Probation Officer in
Washington, D.C. who has been supervising Ms.
McKenzie.  I received a report from Officer

Zampano that the Washington, DC Office of
Probation had informed him that the defendant
had not reported via telephone as she was
required to on several different occasions.  I
have since inquiring, been told it's been five
occasions and that four of them occurred before
the officer reviewed the conditions with Ms.
McKenzie in January '07 and addressed the issue
of the non-compliance.  So that one of those
failures to report occurred after that review,
and it occurred according to the officer on
April 12, 2009.  The other four occurred in
2008.  And this had just been brought to my
attention on Friday, and I don't know what the
defendant's view of this report is but in the
event there was going to be any dispute about
it, I have asked the Probation Officer to be
available by phone.

    MS. POLAN:  Yes, your Honor.  I got I
think an e-mail from Mr. Zampano about this, and
I don't know if it was Thursday or Friday, but I
asked him if he could give me the specific
information so I can go over it with my client,
a document or something, a report, and he said
it had been a verbal report.  And between the

first and second communication, we heard the
incidents went down from seven to five.  It was
hard for me, in the absence of any specificity,
to talk to my client about it.  Mr. Zampano
brought it to my attention as a courtesy and
said he would have to inform your Honor.  It is
kind of difficult.  I did talk to my client
about it.  She indicated there were a few
occasions on which she did not report
telephonically.  What she indicated I said in
the absence of any specific dates, it was hard
to discuss it.  She said originally she was
supervised by Nicole Owen even though in
Washington in a program she was supervised and
transferred there.  She didn't understand
initially when she came up to Connecticut, she
had to call them when it was court related.
There was a couple of times that happened.  My
client indicated she didn't think there had been
any incidents in 2009.  She said once or twice
she forgot to call.  It is kind of hard to
respond to a specific allegation without even
knowing the dates and times, and that's what she
told me in response to this sort of general --
              THE COURT:  The officer in D.C. had

1   advised Officer Zampano there had been five

2   occasions since placement with this officer or

3   with the D.C. office.  I think Officer Zampano

4   in his report to me reported seven.  I think it

5   is five is what the D.C. officer had said and at

6   my request, Officer Zampano contacted Officer

7   Smith and given the specific information,

8   indicated that on October 5, November 9,

9   December 21, and December 28 of 2008, Ms.

10  McKenzie failed to check in by telephone.

11      There was a review of her conditions in

12  connection with this non-compliance in January.

13  I don't have the specific date in January but

14  Officer Smith apparently sat down and spoke with

15  at least Ms. McKenzie and pointed out there had

16  been non-compliance.  Obviously the compliance

17  had improved but there was one incident on April

18  12, 2009 in which the D.C. officer says that

19  there was a failure to make a telephone report

20  as required by her conditions.

21          MS. POLAN:  Ms. McKenzie doesn't have her

22  book, and she has a book at home that tells her

23  who she reported to on April 12.  That's the

24  problem with not knowing the dates in advance.

25  So I don't know how the Court wants to handle

this.  This is the first time that anybody told me what the alleged date was.  I know one of the dates you mentioned, you read them relatively quickly, one was a day in December she was required to come up for Mr. Davis's sentencing hearing.

THE COURT:  There were two in December. December 21 and December 28.

MS. POLAN:  I believe that is.  I don't have my book.  I'm pretty sure the 21 was his sentencing.  It is somewhat difficult is the way the conditions, her conditions of release have worked that were set up with Magistrate Fitzsimmons, whenever she wanted to travel anywhere to see her family or anything else, she had to go through Nicole Owen and Pretrial Services and then through me and Attorney Patel, and at some point it got relaxed to then Nicole Owen would contact Magistrate Fitzsimmons' chambers.  When she wanted to go to Atlanta in a wedding in April, she contacted Nicole whenever it was so there's always been a dual supervision reporting.

As I said, she indicates she did report on April 12.  She doesn't have her book.

1          THE COURT:  She knows without her book as
2     she sits here now?
3          MS. POLAN:  I'd say since she had a
4     meeting with the Probation Office in January to
5     review what was going wrong that she didn't
6     understand.  She said he has maintained some
7     records about that.  Like I said, I didn't know
8     there were any incidents in 2009 until I got
9     here today.  I knew there was a problem last
10    year.
11         THE COURT:  Is it the defendant's
12    position that the failures to report were
13    related to traveling outside of the district in
14    every instance or a failure to call?
15         MS. POLAN:  Sometimes she said she
16    forgot.  On a couple occasions, she forgot.  On
17    a couple of occasions, she misunderstood at the
18    government's request which she was that she also
19    had to report telephonically.
20         Do you want me to not talk while you are
21    doing that?  She indicated it isn't always the
22    same person.  That's why she was trying to keep
23    a record.
24         THE COURT:  The record should reflect
25    that I have asked the clerk to try to reach

1   Officer Smith which we're going to do now.

2   Sorry for the delay.

3        MS. POLAN:  May I make one more comment?

4   My client said when she met with Officer Smith

5   in January, and they went over these miscalls,

6   she said that some of them she said she was

7   traveling at least one time to Connecticut, and

8   she said she did forget.  She also said that she

9   didn't have specific records, and the way the

10  system works, there she was a weekly telephone

11  reporting.  It wouldn't be to Officer Smith.  It

12  would be to whoever answered the phone.  When

13  Officer Smith said in the January meeting, do

14  you know who she talked to.  She said no.

15  That's when she started writing it down.  That's

16  why she said she probably does have a record at

17  home.  It would not have been a conversation

18  with Officer Smith.  She only had occasion to

19  speak to her when it was a problem.

20       THE COURT:  That's why I'm interested in

21  finding what system they use in D.C. to create a

22  record.

23       Good afternoon.  This is Judge Hall

24  speaking.  Do I have Probation Officer Sharon

25  Smith?

THE PROBATION OFFICER:  This is Officer Smith.

THE COURT:  This is Judge Hall in the District of Connecticut.  Good afternoon to you. My understanding is that you have been supervising Shamere McKenzie who is before me today in connection with a sentencing.

THE PROBATION OFFICER:  Yes, ma'am.

THE COURT:  I was advised through Officer Zampano's report to me that you had indicated some failures to contact and report by telephone by the defendant Ms. McKenzie.  Is that correct?

THE PROBATION OFFICER:  Yes.

THE COURT:  The detail that Officer Zampano gave me there were four occasions in December which you then sat down and spoke to Ms. McKenzie, basically reviewed the obligations and conditions and assessed that non-compliance.

THE PROBATION OFFICER:  Yes, ma'am.

THE COURT:  But you indicated to Officer Zampano, there had been a failure to report on April 12, 2009 after your conference.

THE PROBATION OFFICER:  Yes.  That's the most recent one.

THE COURT:  The defendant's counsel

indicated that she was not aware of this, and, therefore, did not come prepared, and Ms. McKenzie apparently since she had sat down with you, indicated through her counsel that she had kept records of whom she spoke to on which day when she called in.  My understanding from her side that in D.C., it isn't that she speaks directly to you.  She could speak to whomever she reaches when she dials the number and record should be made when she calls?

THE PROBATION OFFICER:  That's correct. When she calls on the general line, she would speak with the program assistant, a front desk clerk Tim Andrews.

THE COURT:  And have you ever had a situation in the past where someone did check in and the record was not accurately made?

THE PROBATION OFFICER:  Yes, that has happened before.  I can check if Ms. McKenzie did call in April 12 on Mr. Andrew's records. Before I go to non-compliance, I do check with Mr. Andrews first to see if he had a call and the record has not been reported accurately, and according to Mr. Andrews, there's no record of Ms. McKenzie calling during that week.

1      THE COURT:  You did that obviously before

2   the compliance meeting you had in January of

3   2009?

4      THE PROBATION OFFICER:  Yes, ma'am.

5      THE COURT:  I don't know if anyone else

6   has any questions of the officer.  I'm satisfied

7   myself.  No.

8      MS. POLAN:  Can I ask your Honor to ask

9   one other question.  Are there times in the day

10   when Mr. Andrews doesn't answer the phone?

11      THE COURT:  I guess.  Officer, the

12   question is really is Mr. Andrews have primary

13   responsibility for this, what happens when he's

14   away from his desk, is there someone that stands

15   in or a voice mail?

16      THE PROBATION OFFICER:  The line is

17   officers from other offices.

18      THE COURT:  Someone else picks up?

19      THE PROBATION OFFICER:  Yes, ma'am.

20      THE COURT:  Anything further from anyone?

21      Thank you very much, Officer Smith.  I

22   appreciate your availability.

23      THE PROBATION OFFICER:  You are quite

24   welcome.  Thank you very much.

25      THE COURT:  There was a motion to seal

filed last week that I'm not sure, I guess I
didn't have the attachments.  I have since
received the attachments by fax today and
reviewed them.  And is there any objection to
the motion to seal the material dealing with
confidential mental health records?  I suspect
some of which will be the subject of discussion
today generally speaking but the details of the
records, it would be my view are appropriately
sealed from public viewing.  Would you agree?

MS. PATEL:  I would, no objection.

THE COURT:  The Court finds that the
defendant's interest in privacy as to her
personal mental health records and details
thereof outweigh the public's interest in having
access to those documents.

The only thing I would point out, Attorney
Polan, is that one of the documents dated August
3, 2007 which is a single page sheet of paper.
I couldn't read in the fax version.  I don't
know if it is any more readable in any form.
I'm alerting you while I reviewed everything, I
have not reviewed that.

MS. POLAN:  The copy I have wasn't that
good either.  Perhaps I can hand up a copy I

1   have to the Court's Clerk.  It wasn't a good fax

2   when I got it.

3          THE COURT:  That's fine.

4          MS. POLAN:  (Handing.)

5          THE COURT:  Thank you very much.  I had a

6   note to myself probably from the first time I

7   read the report that was sometime ago, the

8   question mark of financial affidavit.  Has one

9   been filed with the Probation Officer?  The

10   original report which came in sometime ago

11   indicated that it had not.

12          MS. POLAN:  Your Honor, if that hasn't

13   been filed, I think it is my oversight.  I

14   believe I will have my client submit it.

15          THE COURT:  You are appointed counsel?

16          MS. POLAN:  I am.

17          THE COURT:  I assume her financial

18   situation has changed somewhat?

19          MS. POLAN:  It has, your Honor, to the

20   extent that she has been working full time and

21   going to school, it's true.  Her situation has

22   changed.  I don't think it's changed to the

23   extent with respect to counsel.  But if the

24   court's inquiry has to do with paying a fine, it

25   certainly has changed to some degree.  I

1  apologize to the court.  I have been so immersed

2  with the other ancillary issues in this case, it

3  slipped my mind to file one.  She takes home

4  $800 every two weeks.  I will file that

5  affidavit in terms of assisting the court.

6        THE COURT:  Does she have any assets by

7  way of bank account or car or anything like that

8  that would have value?

9        MS. POLAN:  Your Honor, she has a bank

10  account for paying her bills.  She doesn't own a

11  car.  I can attest her cell phone was turned off

12  for non-payment quite recently.

13        THE COURT:  The only banking account is a

14  checking account.  She has no savings.

15        MS. POLAN:  There's $5.00 in the savings

16  account.  She has been living on her own since

17  she was released for the reasonable component of

18  that program, and she has an apartment to

19  support in Washington.  I think she's probably

20  living paycheck to paycheck.

21        THE COURT:  I'm going to direct, I would

22  like to say before you leave the courthouse

23  today, that a financial affidavit be completed

24  and delivered to the officer and be made a part

25  of the Presentence Report.

1          First, I will state that I understand my

2     obligation to impose a sentence her today after

3     consideration of all of the factors cited by

4     Congress and the statute which the court intends

5     to do.  I will consider all of the factors.  I

6     will begin with the sentencing guidelines, and

7     in connection with the sentencing, I would ask

8     first if there were any objections to the

9     Presentence Report to the extent that it sets

10    forth any facts which might be the basis for the

11    Court's decision on sentencing?

12         MS. PATEL:  None from the government,

13    your Honor.

14         THE COURT:  From defense?

15         MS. POLAN:  Your Honor, I put my

16    objections to the Presentence Report

17    calculations in writing.

18         THE COURT:  I understand.  I have them in

19    front of me.  My question is whether you have

20    any objection to any of the facts set forth in

21    the report.

22         MS. POLAN:  No.

23         THE COURT:  The Court adopts the

24    Presentence Report to the extent it sets forth

25    the facts that might be relevant to the court's

1    sentencing decision here today.  So we can turn

2    then to the guideline calculation which I'm well

3    aware that the defense objects to.  And in that

4    regard, if I understand your position, Attorney

5    Polan, you do not think that I would leave

6    guideline 2G.  In other words, that the office

7    has it wrong in using 2A3.1, is essentially what

8    I understand your position to be.

9         MS. POLAN:  I think my position is that

10   2A3.1, yes, should not be used, yes, your Honor.

11        THE COURT:  The difficulty and I think

12   you argue that the A4 should be used because

13   obviously the defendant was not convicted under

14   any of the specific sections cited in one

15   through three.

16        MS. POLAN:  Yes.

17        THE COURT:  My question to you is how is

18   it that you ignore the cross reference in C3?

19   That if the offense involved conduct described

20   in 18 U.S.C. 2241 and 2242, it sends you to

21   2A3.1.  How do you avoid that cross reference?

22        MS. POLAN:  I don't think that her

23   conduct, that her offense conduct.  I think

24   that's a difference in opinion.  I don't think

25   her offense conduct brings into play the cross

1    reference.

2         THE COURT:  Her offense.  I think

3    actually as the word offense is used in the

4    guidelines, it includes offense conduct.

5    Clearly her offense is conspiracy to commit a

6    Mann Act violation.  Since the guidelines treat

7    conspiracies as if they were the substantive

8    offense, I don't understand how the offense for

9    which she was convicted conspiracy to commit a

10   Mann Act violation clearly involves conduct

11   described in 2241 or 2.  Would you disagree with

12   that?

13        MS. POLAN:  I make a distinction between,

14   your Honor, and the Court may disagree with me,

15   upon his offense conduct and her offense

16   conduct, and the Court may disagree with me,

17   that that is a meaningful distinction but I

18   think that the basis of her guilty plea, your

19   Honor, if you look at the stipulation of offense

20   conduct and what the government alleges she did

21   to participate in the conspiracy, it is

22   basically in the nature of driving, collecting

23   money, telling the other victims of Mr. Davis

24   what the rules were.

25        THE COURT:  I think we can all agree that

there's no allegation Ms. McKenzie engaged in

the any sexual conduct vis-a-vis another person

other than Mr. Davis I suppose in the sense of

she herself didn't commit aggravated sexual

abuse.  I think the government would agree with

me on that.

MS. PATEL:  Correct.

THE COURT:  Personally, correct?

MS. PATEL:  Yes.

THE COURT:  The difficulty for you,

Attorney Polan, 3G whatever.  3G1.3C3 says if

the offense involved conduct and offense is

defined in the guidelines in section 1B1.1 as

meaning the offense of conviction and all

relevant conduct unless a different means is

specified or otherwise clear from the context,

and it is clear to me that both that the offense

of conviction, crime to which she pled guilty is

a conspiracy to commit a Mann Act violation and

that it involved aggravated sexual abuse, not by

her but she's part of a conspiracy.  And to the

extent it also involved relevant conduct as

defined under 1D1.3 that's determined on the

basis in the case of a jointly undertaken

criminal activity, all reasonably foreseeable

1   acts, omissions of others in furtherance of the

2   jointly undertaken criminal activity so I am

3   well aware of the difference between the conduct

4   of Ms. McKenzie and the conduct of Mr. Davis.

5   And I would agree with you as I think the

6   government does that this guideline is not a

7   very effective guideline under the circumstances

8   but I am hard pressed to conclude it is not the

9   guideline.  So unless there's something that you

10  think I'm overlooking or I'm making some

11  misjudgment.

12          MS. POLAN:  No.  I understand what you

13  are saying.  I wanted to look up one other thing

14  before I concede on this, your Honor, unless I'm

15  confused which I could be, it appears to me that

16  the cross reference contained in 2G1.3

17  subsection C3, refers to 18 United States Code

18  2241 and 2242.

19          THE COURT:  Yes.

20          MS. POLAN:  I think our crime is 2421.

21          THE COURT:  I know that.  I understood

22  that.  The difficulty is if the guideline is

23  meant to only cover the actual crime of

24  conviction, I think it would have said if the

25  offense involved a crime under fill in the

blank, then go to this section which, of course,
it never would do.  It would have told me in the
index when I looked up that section of the
statute which section to go to.  I would never
need a cross reference for a crime being
committed.  I think the language is clear when
it says offense involved conduct described in
those two statutes 2241 or 2.  But if it is, I
think they are sending to you 2A3.1 if that's
higher which I don't think it is disputed 2A3.1
is higher.

MS. POLAN:  It is higher, yes.

THE COURT:  I should add I'm not in
agreement with the Probation Officer.  He's an
excellent officer, and I usually agree with him.
I do not believe that the additional enhancement
for multiple applies under 2G1.2G1.C3 sends you
to 2A3.1.  That's where you are.  I mean there's
the base level.  There's enhancements there.
Just like 2G has those so I don't see any
reference to a cross reference back in the A3.1
that you would go and use subpart G of 2G.1
there.  I think subpart C told us if you qualify
under C3, then the correct guideline is found in
2A3.1 and that's it.  You don't come back here

1    so I'm not in agreement with the officer on that

2    aspect in which he added in the Presentence

3    Report, he added an additional four levels I

4    guess it was, and I would not intend to do that

5    unless the government presses it on me I

6    suppose.  I don't think the defense will.  Other

7    than that, I was in agreement with the Probation

8    Officer's calculation in paragraphs 32 through

9    39.

10        MS. POLAN:  Does that mean that you also

11    agree in paragraph 36 that Ms. McKenzie should

12    be characterized as a leader and organizer?

13        THE COURT:  We can talk about that.  You

14    have excepted to the enhancement so we should

15    discuss each one of those.  I guess the fact as

16    set forth in the Presentence Report as I'm

17    familiar with them is that she played a role

18    that would qualify her for that two-level

19    enhancement.  The phrase leader and organizer is

20    perhaps not the best words to describe it.  If

21    you go to 3B1.1 which I will in a minute,

22    obviously Mr. Davis earned himself four points

23    as an organizer or leader, that involved five or

24    more participates and the two level enhancement

25    for organizer, leader, manager or supervise in

any criminal activity other than described in A
and B.  I guess I would like to hear the
argument why that guideline doesn't apply.

    MS. POLAN:  Well, your Honor, just
because somebody pleads guilty to be part of a
conspiracy doesn't mean they automatically
should get the role enhancement.  There's no
factual stipulation nor is there I don't think
any evidence which indicates that she, as I
said, I think that the facts of what Ms.
McKenzie did do and has acknowledged doing is
what gets her into the conspiracy.  I don't
think that that automatically gets her or should
get her an aggravating role enhancement.  It's
pretty clear that it was Mr. Davis who was
running this human trafficking organization on
his own, and he was the sole financial
beneficiary of it.  I don't think she becomes a
supervisor solely because of the fact that led
her to be guilty of the conspiracy.

    THE COURT:  Let's strike the word
organizer.  Let's use the word manager or
supervisor.  You would contest that the fact
that is undisputed would qualify her as a
manager or supervisor?  You yourself in your own

orders said she was instructing other girls
about the rules of the business.  She
reported to Mr. Davis about the work.  She
collected money from other prostitutes.  She
deposited money.  She paid expenses on behalf of
Davis.  She booked hotel rooms.  The
government's view is she did a few other things.
Even that you would argue doesn't qualify her as
a manager or supervisor?

MS. POLAN:  Well, I guess the problem,
your Honor, is once again I think this guideline
is not particularly written great for the
offense conduct that we're looking at her for.
Usually one would think that someone is a
manager or supervisor in some criminal activity
is getting some financial benefit from it.  In a
drug conspiracy, business-type conspiracy,
financial fraud but as I said, your Honor, I
think that the same conduct that is the only
conduct that makes her guilty of the conspiracy
itself that if she wasn't doing the things that
your Honor just pointed out, that she's agreed
that she did do, I don't think she would have
been guilty of being part of the conspiracy.
She would have been another of his victims.

1    That's all I'm trying to say.  I don't think

2    there's any additional conduct.  I don't think

3    that this particular guideline is really

4    suitable for the factual scenario we have here.

5         THE COURT:  Does the government have a

6    position on this?

7         MS. PATEL:  Only that I think your Honor

8    is correct.  I think she clearly is and why she

9    was charged and why the other victims were

10   charged.  She's clearly a supervisor, manager.

11   I myself was careless saying not organizer,

12   leader when I was responding in my memo.  It was

13   to argue against the minimal participation.  But

14   her activities of transporting, booking hotel

15   rooms, being quite frankly his most trusted

16   person in his enterprise and the

17   responsibilities that she was given makes her a

18   supervisor leader, I don't put her in middle

19   management.  If I were to rate it she would be

20   above the victims.  To that end those two points

21   do apply.  I will also mention, you know, even

22   with or without those two points, her offense is

23   well above the statutory max.

24        THE COURT:  I'm trying to move along what

25   I'm required to do.  I can't not make findings

that are supported by the record.  Assuming and
that I have already found 2A3.1 applies, do you
object to the enhancement under subpart B1 of
that section which adds four levels to the base
offense of 30?  I'm trying to find out what your
objections are.

MS. POLAN:  I was going by the paragraph.

THE COURT:  I'm at paragraph 34.

MS. POLAN:  That's the same argument.  It
is the same argument to the extent the court has
rejected the argument.  I think it should reject
it there as well.

THE COURT:  35, there's two levels added,
there's a minor victim over 12 but under 16,
would you argue that doesn't apply of B2 of
3A2.1?

MS. POLAN:  If 2A 3.1 applies then that
does apply.

THE COURT:  Does the government make a
motion for acceptance of responsibility of the
third point of 3E1.1B?

MS. PATEL:  Yes, we do, your Honor.

THE COURT:  Do you recommend a finding of
acceptance?

MS. PATEL:  Yes.

1          THE COURT:  The court grants the

2    government's motion for the third point of

3    acceptance and also finds that the defendant has

4    accepted responsibility.  Both by her entry of a

5    guilty plea very early in the process and also

6    by her willingness to cooperate.  The government

7    finds the guidelines as follows: the guideline

8    2X1.1A directs that the base offense is

9    determined by the substantive offense.  That, of

10   course, is 18 United States Code 2421.  The

11   guideline for that is 2G1.3.  However, the cross

12   reference at subpart C3 of that guideline

13   directs me to 2A3.1.  For the reasons I have

14   already described in the record because it

15   involves conduct found described in 2241 or 2242

16   and the offense level is higher.

17        Therefore, there's a base offense level of

18   3, four levels are added under subpart B1

19   because it involved conduct described at 2241A

20   or B.  Two levels are added under subpart B2

21   because there was a minor victim who was less

22   than 16, more than 12 and two levels are added

23   because the defendant was a manager or

24   supervisor as described in 3B1.1c.  That adds up

25   to a total of 38 points less the three for

acceptance would be 35.

The court finds the defendant has no prior criminal history and, therefore, at a 35, level one, the guideline is 168 to 210 months. Is there any suggestion that I have made an error in that? I obviously understand the defendant's position that this guideline doesn't apply. Otherwise assuming I'm going to apply, have I determined the guideline correctly?

MS. PATEL: Yes.

MS. POLAN: Yes, your Honor.

THE COURT: All right then having determined the guideline, we can turn to -- I don't know of any particular sentencing guideline or policy statements that would particularly apply here. Do you, Attorney Patel?

MS. PATEL: No, your Honor.

THE COURT: Thanks. Then we need to turn to, first turn to the government's motion. I should say that the guidelines 168 to 210 but the defendant pled guilty to that crime that carries a maximum penalty of 60 months so that in effect becomes the guideline. I should state for the record if anyone up above is interested in this, that I view the guidelines as

originally calculated as having very little
relevance to this sentencing.  In fact, I can't
imagine that I will have in mind along with
everything else that I already know about the
case both positive and negative for the
defendant that that that guideline really
informs me of anything, and I can start with the
reason being that with the maximum of 60 months,
it is so out of proportion to that maximum, I
don't think it's going to be much use to me in
weighing the various factors.  Obviously the
guideline is 60 months under the statute.

The government has a motion and I guess my
first question with regard to it, there's a
motion to seal and I asked why this has to be
sealed at this point given what is known on the
record.

MS. PATEL:  You know, your Honor, I think
I keep exercising a lot of care in this case.
In light of particularly the facts that have
already come out in the defense memo, I don't
think it needs to be under seal.

THE COURT:  Does the defendant request
that I seal the government's motion?

MS. POLAN:  May I have a moment?

1           (Speaking with the government

2           counsel.)

3           MS. POLAN:  No, your Honor, given what I

4    put in the sentencing memo that I filed I think

5    the presumption in favor of openness of filings.

6    I don't think there's good argument at this

7    point to seal it.  I asked Attorney Patel what

8    the status was of Mr. Carter.  He's on bond.

9    That's all I asked.  I know he entered a guilty

10   plea.  I didn't know if he was incarcerated or

11   not.

12          THE COURT:  No.  It's not where Ms.

13   McKenzie lives.  He's not supposed to be where

14   Ms. McKenzie lives.  If she were to see him, she

15   should report that immediately.  The court will

16   direct that the motion and memorandum of the

17   government under 5K1.1 be filed.  I only saw a

18   memorandum.  I didn't see a motion.  We may have

19   to correct that but I'll hear you on your

20   motion.

21          MS. PATEL:  Thank you.

22          THE COURT:  Thank you.  Do you wish to

23   address the court or decide it on the papers.

24          MS. PATEL:  I was checking to see if I

25   had a motion separate that I filed.  To the

extent that the government has failed to do
that, at this time, we would like to move for
the government's motion.  To make a motion for a
downward departure pursuant to 5K1.1 in light of
Ms. McKenzie's extensive cooperation.

THE COURT:  Does the defense wish to be
heard or rely on the government's memorandum?

MS. POLAN:  I think that between the
government's memorandum and the defendant's
memorandum, both of which have addressed the
issue, I did feel I needed to address it in my
memo.  As of the date I filed it, the government
hadn't filed anything, and I did get this memo I
think later that same day, the government's
memorandum which supports the oral motion that
was just made, clearly contains more detail than
I was privied to so I think the court should
consider all the detail that the government has
made the court aware of.  I do know because your
Honor also considered the case of the
co-defendant, this has been an unbelievable
tortured proceeding for everyone involved.

THE COURT:  It isn't over yet.

MS. POLAN:  That's right, including my
client that she was arrested back in January of

2007 and now May of 2009, which I would say that
probably fair to say that virtually 100 percent
of the time has passed has to do with Mr.
Davis's use and abuse perhaps of the legal
system but it is what it is, and I think the
court knows that the government, then asked my
client to cooperate against the second
individual, and she was prepared to be sentenced
in March and then that was delayed and then I do
believe his decision to plead guilty was based
as well on the cooperation.  I did indicate I
think that this is an usual situation and that
the first day I met Ms. McKenzie at her
presentment when Judge Fitzsimmons asked me to
represent her as a CJA attorney, she indicated
she was already cooperating with New York
authorities and had been for several months.  I
think there's never been any wavering in her
cooperation.  As the government indicates that
her cooperation is critical both to the
prosecution of Mr. Davis and in Mr. Carter and
in spirit.  These children having to come to
court to testify which I think is a very, very
significant issue.

       THE COURT:  Thank you.  The court is

required to evaluate the government's motion
using five factors set forth in 5K1.1.  I'm
going to take theme slightly out of order.  The
timeliness of the defendant's assistance as
Attorney Polan has commented was as timely as it
could be.  I believe that my understanding is
that the defendant came forward and offered to
cooperate very early after her arrest and
obviously the sooner that she did that, the more
useful it is to the government.  The court also
has to consider the nature and extent of the
defendant's assistance as has been noted.  This
case has dragging on for quite awhile and during
the course of the time that the case pended, the
defendant was called upon to provide assistance
to the government.  First in the form of
debriefings or interviews and information and
then in willingness to testify against Mr. Davis
and more recently a willingness to testify
against Mr. Carter.

All of those, the nature and extent of that
is substantial in the court's assessment.  Many
times we'll grant a motion for departure when
the defendant's cooperation has consisted of
being interviewed and providing useful

information.  The willingness to testify
publicly and face Mr. Davis, in particular, is
an extent of cooperation that's beyond what the
court normally sees.

Another factor is any injury that the
defendant suffers or any danger or risk to the
defendant or to her family for her assistance.
The court is not aware of any actual injury that
the defendant has suffered or a member of her
family has suffered as a result of her
assistance.  However, first the Court's view is
whenever anyone cooperates there's always the
risk of injury.

In this instance, the risk was more than
speculative.  In this instance there is evidence
that Mr. Davis, one of Mr. Davis's ways of
maintaining Ms. McKenzie in his employ was to
threaten harm to a family member, and after Mr.
Davis was arrested, he, of course, couldn't do
that but nonetheless we know from the second
case brought by the government in relation to
this matter involving an obstruction of justice
charge, there were means where Mr. Davis could
reach beyond his jail cell to try to effectuate
this prosecution to other people.  I think the

risk of injury to the defendant or her family in
this instance resulting from her assistance was
a fairly real one that really did not come to
fruition.

Another factor is the truthfulness and
completeness of the liability that the defendant
provided in the government's assessment that the
court relies upon.  In this respect is that all
the information she provided was extremely
truthful, was corroborated by other witnesses
and that the information, the physical evidence
she provided was always reliable.

Lastly, it's the evaluation of the
assistance rendered, that's the significance and
usefulness of the defendant's cooperation, and
in this instance, the court has to rely on the
government to a great extent.  The government in
their memorandum points out that her assistance
was extraordinary.  Without it the government
would not have been able to locate two of the
victims involved and that one of whom was
particularly brutalized by Mr. Davis and further
with her information, we were able to interview
additional victims and bring additional charges
against Mr. Davis and Mr. Carter.

Further, the nature of the information she provided could only come from someone who was involved in the scheme and was extensive and there was critical physical evidence the government indicated which was crucial to their case as well as information about conversations and transactions she engaged in with Mr. Davis and the information she provided allowed the government to be able to investigate further and obtain further evidence and locate, as I say, additional victims. Given that I believe the first victim the government was aware of was a minor victim, I believe that without Ms. McKenzie's cooperation, I think the case would have been on very shaky grounds against Mr. Davis who demonstrated in this courtroom, I will say his personality as he sought one time on a motion to continue the sentencing to intimidate the victims who were in the courtroom and so I think it might have been very questionable that the minor victim could have stood up in a courtroom to cross-examination and without being corroborated.

As I understand it, Ms. McKenzie not only provided the corroboration of that victim but

also identified other victims that led to more
cooperation and, of course, I think would have
been a substantial witness in the sense of her
ability to take the stand and to withstand his
cross-examination in a way that the younger
victims could not.  That I think I agree with
the government's assessment I think it is the
government's assessment that her cooperation
played a very key role in Mr. Davis's entering
into a plea with the government and likewise
with Mr. Carter entering into a plea which
certainly in the first instance with Mr. Davis
meant that the minor victims did not have to
recount the terror that they lived with so that
also satisfied that fifth element that I have
been discussing.  That's the significance and
usefulness of the defendant's assistance.

For all of those reasons, the court finds
that the defendant has provided substantial
assistance and that the government's motion for
downward departure under 5K1.1 is granted.

I would like to hear from the defense
counsel on the issue of sentencing generally.
In addressing all of the factors I have to
consider and if the defendant wishes to address

the court, I leave it to you, Attorney Polan, to let me know.  I want to be sure that Ms. McKenzie knows she has that right.  If she wants to, of course, I will be pleased to her from her. If she doesn't, I understand.  I leave it to you to let me know.

MS. POLAN:  There are three people who want to address the court.  Ms. McKenzie and her mother and Ms. Tina Frundt who also wants to address the court.  I don't know if the court would like me to make my comments before.

THE COURT:  Why don't we have those folks address the court first, if you don't mind, Attorney Polan.

Good afternoon.

THE WITNESS:  Good afternoon.  My name is Ms. Walker.  I am the mother of Shamere McKenzie.  Shamere grew up without a father. Her father died when I was three months pregnant.  We migrated to the United States of America.  Shamere has been a role model. Shamere has done everything within her powers to hold her head up and look up in life.  She had a full scholarship to Saint John's University. However at the time, I was unemployed.  Shamere

has done tremendous things in her life to move
on and put these issues behind her.  I know that
you know she feels a lot of guilt on what she
has done and that she always is trying to put
behind her because has she said to me.  She said
Mom, in spite of everything that I have done in
the past, there's only one thing that I think
that I would love to do, Mom.  There's no doubt
in my mind that I would love to become a lawyer,
to find people who cause me to go through the
stuff that I go through, to put them behind bars
for the rest of their life and that's her
intention and that's where she's intended.  I go
behind her 100 percent.  That's what she wanted
to do.  She never wants another person, another
victim like herself to go through the stuff that
she has encountered.

       THE COURT:  Thank you very much.

       MS. POLAN:  The next is Tina Frundt.  I
did submit some materials to the court about
Ms. Frundt.

       THE COURT:  Good afternoon.

       THE WITNESS:  Good afternoon.  My name
Tina Frundt.  I was the former director of
Client Services and currently director and

Founder of Courtney House that help the victims.
I'm also a survivor. From the very beginning
in the 2007 case in January, I was involved in
the very beginning of finding Shamere a
placement. I said in the very beginning I still
believe and still do that she's a victim in the
case. To understand the victim background, why
I would say she's a victim and obviously she has
to do some controlling parts in it because she's
also controlled. Unfortunately when you
involved under a pimp's control, you are forced
to do things that you wouldn't normally want to
do. Not only are you forced to do things that
you wouldn't normally do, you have to live with
the guilt of things you did when you come out.
The guilt of what somebody forced you to do,
what you have to deal with. Yes, we're saying
she was an adult. She also was aware of the
situation but she was always understanding the
brutality that came upon herself and also
threats of loved ones which put her in a
predicament of having to do something that she
not necessarily wanted to do. I work with lots
of victims, over 1,000 victims as well and being
a child survivor at 13. You also have to do

things that you wouldn't normally want to do.
She wanted to follow the program and she
willingly gave information to the FBI for a
case.  Gave them all the information, found ways
to help herself. We helped her get into school
and did counseling.  That was three years ago.

To this date, I'm still involved with her
and still going to involve at Courtney House and
still do awareness work and let the other girls
know as well with her doing it, it shows yes,
she does feel definitely remorse but she also
understands is the concept of being a victim and
want to help others and not having this done to
others in helping them.  Thank you, your Honor.

THE COURT:  Thank you very much.

THE DEFENDANT:  Good afternoon, Everyone.
First I would like to acknowledge the fact that
I did do some things wrong here and I'm very
sorry for doing these things, especially to the
minor victims, and this case has really opened
my mind as to what I really want to do in life.

Yes, I started out being an attorney.  Since
this case seeing nothing firsthand, the
knowledge that I didn't know before.  Knowledge
of the facts these girls were young.  I was

definitely through force.  I believe that being
in the situation I'm now able I will definitely
be able to become an attorney, defend not only
these girls but put away people.  I want to be
an FBI like Sean, trying to find people.  Being
like Krishna trying to put them away.  One can
read a story in the paper and say oh, I feel a
certain way.  When you are actually in the
situation and know what's gone behind the
scenes, know information the government thinks
they know but they really don't know.  You have
the passion for it.  It's definitely easier to
do your job.  So this case has definitely made
me want to go further and pursue a law degree or
any degree where I can help these girls.

Right now I decided to be a mentor for
children whose parents are incarcerated and that
not only is helping the child but also helping
me because for me, it's kind of showing them and
leading them into a path that they are not
leading up to getting to a pimp.  Teaching them
you don't have to go with a pimp.  You don't
have to listen to what these guys are telling
you.  Nothing by force.  You can do it without
getting involved.  Stay on the right path so

I've taken a path of being a mentor to school children, the younger ones, and show them a different path, and I would like to thank Diane and Krishna and Sean and everybody that's involved to really show me.  Of course, some things I will not agree with but it kind of opens my eyes to see what's really going on. Before this case, I wasn't aware of what pimping was. Some of the serious things happening especially when it comes to children.  Through this I can see firsthand, it's not someone telling me a story.  Not something I'm seeing on TV.  This is my experience.  I think I'm able to help others more efficiently.

THE COURT:  Thank you very much.

MS. POLAN:  Thank you, your Honor.  I wanted to say, your Honor, I did indicate in the written memo, I think this is really such an unusual situation, and I view Ms. McKenzie as a victim, and I understand why the government perceives as well as an offender and a victim but what I think is the most difficult question to answer in this case is why someone like Shamere McKenzie or why Shamere McKenzie who has an enormous number of things going for her, got

caught up in the horrible business.

THE COURT:  If you have the answer, I would be interested in hearing.

MS. POLAN:  The most difficult is she wasn't a runaway.  She didn't fit the profile. The girls and young women who become the victims of Corey Davis, I think that's been the most puzzling part of this case from day one.  I think if you read some of the letters that were submitted, these obviously were submitted by people who knew her in her former life.  What happened to her she had a terrible set back. She had a sports scholarship.  She had an injury.  Her mother was unemployed.  Many of us would say you drop out of school and get a job until you go back, you don't get involved with a pimp, you don't become a prostitute and don't become driving young girls and flying with them. How did this happen to someone like her?  I think that's the most troubling question in this case.  I think that the evaluations that were done particularly the one by the government's expert witness, Sharon Cooper, which I did quote from briefly but I did submit that under seal.

THE COURT:  I have read it again today.

1      MS. POLAN:  I think that's more helpful

2  in trying to understand the different

3  psychological factors that went on in the young

4  women's life to get her to this place where she

5  became his victim in the first instance, why she

6  didn't feel she could leave.

7      THE COURT:  Is she undergoing any sort of

8  therapy or counseling?

9      MS. POLAN:  I think she finished the

10  counseling that she started going to.  She

11  finished with the I think to the therapist's

12  supervision and satisfaction.  There was an

13  evaluation done in the summer of I believe it

14  was 2007.  That's also one of the documents I

15  submitted there's treatment recommendations

16  there.

17      My question is were those addressed at

18  Polar House or anywhere else?

19      MS. PATEL:  Your Honor, I think that what

20  was ordered, I'm not sure.  I think there was

21  mental health counseling that was directed by

22  pretrial services and she did engage in

23  counseling.  I don't know if she's continuing to

24  engage.  She indicated she had finished a course

25  of treatment.  The court may determine that she

needs more treatment.  The particular

constellation of her life and what happened to

her in her early life before she came to join

her mother in the United States, the fact she's

been a single child, a single parent, the fear

of something happening to her mother were pretty

strong motivating psychological factors.  The

court may know she did run away from Mr. Davis

once and she went back.

THE COURT:  I will get to that in  a

minute.  We'll get to that question in a minute.

I read the treatment recommendations of Dr.

Klein who was a supervising psychologist

apparently, I guess I would have been interested

to see if she undertook therapy, after that what

was the assessment of the therapy.  Has she been

able to successfully address some of the issues

the doctor mentioned or am I looking at a

defendant that presents herself in the same way

and when faced with a stressful situation, an

easy way out, if you want to call Mr. Davis an

easy way out and offer her money to deal with

the problem will make the same bad choice or as

I say has she benefited from the therapy?

MS. POLAN:  If you can give me a minute,

1     your Honor.

2              (Speaking with the defendant)

3              MS. POLAN:  Your Honor, I do know that

4     the evaluation with Dr. Klein was ordered.  I

5     believe it was ordered by Judge Fitzsimmons in

6     the summer, and my client indicates that she was

7     still receiving after care counseling at that

8     time and continued that treatment.  I don't have

9     a letter from that person because I didn't.  She

10    completed that treatment, and I will guess she

11    might benefit from additional counseling through

12    the course of the supervision.

13             THE COURT:  I think it that you don't have

14    an answer to that question that I raise.  I

15    think it is the most puzzling fact of this case.

16    I do think a combination of her life experience,

17    that even initially led her to believe that this

18    somewhat charismatic man, that I think Mr. Davis

19    basically sucked her into the vortex of his

20    pimping business before she really knew what had

21    happened to her and after that, it was the

22    beatings, the guns, the threats, and that was

23    his way of maintaining control over her just

24    like all of the other young women and I think

25    that the fact that she was a little older, the

fact that she was maybe a little smarter, a
little more life experience, doesn't change the
basic fact he controlled her just like he
controlled everybody else.  That's I think the
reality here.  To me, your Honor, it's a tragedy
that Ms. McKenzie stands before the court and
going to have a felony record and everything
that she does in her life is going to be colored
by this felony record.  When she got done with
Polaris and moved into her apartment, she wanted
to go back full time.  She applied to the
University of Maryland.  They wouldn't take it
because of this case.  I communicated with them.
She's still pursuing her education.  She's doing
pretty well except in a couple biology labs.
She told me from the beginning that she wanted
to be a lawyer.  I don't know if she can be a
lawyer.  I frankly don't know.  She's really
focused on what she wants to do as a lawyer.  I
think it may be possible.  It may not.  I think
the court is well aware how devastating it is to
a young person to have a felony conviction and
something that colors your entire life.  I do
think since Ms. McKenzie was released from jail,
she did three weeks when she was first arrested

before the issues were worked out.  Since she
got there, I think that you know, what's amazing
is that she's maintained a full-time job.  She's
found a way to continue her education, that she
has done everything she can to get her life back
on track in terms of being a productive member
of society, both through working, going to
school, involved in volunteer activities.  I
know there is a suggestion in the government's
sentencing memo recommending community service.
She's already doing that.  I think that as
Ms. Frundt indicated, she's committed to working
with her program in terms of being a mentor to
other young girls who have been the victims of
human trafficking but I think that it would be a
further tragedy in this case if the court were
to order any further period of incarceration for
Ms. McKenzie.  She's suffered an enormous
amount.  As I said, the fact that she has pled
guilty to a felony and will have this for the
rest of her life.  She has served some very
brief amount of jail time.  I think that an
appropriate sentence in the case is a sentence
that is a sentence involving supervised release
for a period of time with whatever types of

conditions that the court thinks are
appropriate. I don't think it is a case where
house arrest would be a really helpful thing
because, in fact, she works full time. She goes
to school. Not quite full time and is out
trying to mentor the community. I think there's
some cases where house arrest is an appropriate
sanction short of incarceration. I do think the
court should, and I will consider the fact that
her life has been completely on hold since the
end of 2007 because of Mr. Davis and that she
has been basically, she's not in house arrest
but she's been under the supervision of the.
Court we're going on 27 months now.

With the exception of this issue that was
raised about not calling into probation, there
was an incident when she was at Polaris Project
that was brought to the attention of the court
one disciplinary issue. Other than that, her
behavior has really been I think really
completely appropriate, law abiding. She's not
somebody who has gotten out of jail after a
brief period of pretrial incarceration and gone
and committed more crimes. She in fact was
trying to when she ran away from Mr. Davis the

second time.  She immediately contacted an

attorney in White Plains to try to deal with

these pending prostitution charges she had from

the activities she was engaged in and had been

speaking with a Queen's District attorney for

several months before she was charged in this

case.  I think the collateral consequences to

her for the rest of her life probably because of

what happened to her and the fact she was

prosecuted and she does have a felony conviction

and enormous significant punishment I guess all

of the goals in the sentencing in the case would

best be served by ordering a period of

supervised release probation, and any

appropriate conditions that would allow her to

continue to try to get her life back together as

I think she's been trying to do since she was

released on bond in late February of 2007.

THE COURT:  If I could ask you a question

and before I ask it, I will say that I have had

not many but I have had a number of sexual abuse

litigants in the front of me both plaintiff in

civil cases or defendants in criminal cases, and

I would never be able to understand what any of

them have gone through including what Ms.

McKenzie went through so I hope that my question will be understood in the spirit of that remark, but to the extent that you argue Ms. McKenzie was a victim. I really don't disagree with you on that. But the government presses she was not just a victim she was a participant in the conduct which, of course, is why they indicted her. To the extent her role as a victim overcomes her role as a participant which is really what I think your argument to me is, that rests on the assumption that she couldn't do anything about what she was involved in, what she was being forced to do to the other individuals and what she had to do to stay there either because of the threats to her family member or her own threats to herself which were backed up not only by threats but actual physical violence to her. I don't question that it is incredibly difficult to leave an environment of sexual abuse, that's accompanied by physical, not threats, but actual physical violence but there came a time that Ms. McKenzie did leave, right?

     MS. POLAN: Yes.

     THE COURT: And so it must be true that

1 she could leave. I can see Ms. Frank in her

2 experiences not agreeing with me. I knew you

3 wouldn't agree but I'm going to pose the

4 question anyways. I suppose the answer you can

5 give me there just came a point in time when the

6 addition of all the conduct that was directed to

7 Ms. McKenzie and all she was being made to do

8 were enough to overcome the threats, et cetera.

9 But for me to, in effect, view her as a victim

10 solely, it has to be that she didn't have the

11 capacity to leave and so I guess my question to

12 you how do I come to that conclusion if, in

13 fact, before she did leave, she engaged in, in

14 the government's view, I don't know if you

15 contest this but the government's memorandum

16 indicates a stabbing of one of the females at

17 the Bridgeport strip club along with controlling

18 them, directing them, telling them not to give

19 their age and all that sorts of things.

20 MS. POLAN: I want to go back to what I

21 said in the beginning, I think what I said was

22 that in order to see her more wholly as a

23 victim, you would have to conclude that she

24 didn't have a capacity to leave.

25 THE COURT: May be the wrong word.

1       MS. POLAN:  What struck me about that,

2   your Honor, it is hard for me as well.  Hard for

3   me to fathom any set of circumstances in my own

4   life that could lead me down that path.  If I

5   didn't have the money for school, I would get a

6   job.  That's sort of how could you end up here.

7   But I'm -- I wasn't in her psychological shoes.

8   I think that it's also hard for me to understand

9   because I have never been a victim of constant

10  threats and violence and the sort of

11  perpetuation of control by threats of violence.

12  That's why I deferred to Dr. Cooper who I know

13  your Honor heard at the Daubert hearing in Mr.

14  Davis' case and I wasn't able to be here that

15  day.

16       THE COURT:  I said today I reread the

17  report.

18       MS. POLAN:  I think that somebody who is

19  an expert on what actually happens I think that

20  most of these girls did run away.  That's one of

21  the things in this case.  Girls who were younger

22  than Ms. McKenzie ran away.  I don't think that

23  makes them any less victims because they ran

24  away.  I think sometimes when you run away, you

25  get killed.  Sometimes when you get to run away,

you get to stay away.  That's always the
calculation for these victims.  They may be
successful in running away and they may not.  I
can't say what the calculus is, that
psychological calculus of when the sort of
threat to your family or the perceived threat to
your family or the physical abuse you yourself
are suffering when that sort of becomes so
great.  I mean what the calculus is
psychologically help as a victim to leave.  I
don't know.

THE COURT:  I can't help but think,
though, that we have other victims in this case
including minor victims and that and I went back
and looked at the assessment of the report you
just mentioned.  She uses the word conditioned
by Mr. Davis.  But I wonder how many of those
victims that Mr. Davis had, the other victims,
the minor victims, and the adult victims he
would have had but for the assistance of Ms.
McKenzie.  She's not.  Is she a victim as the
same as they are?

MS. POLAN:  One of the differences is
that she's an adult and they are not.  I think
that's one distinction, a legal distinction, a

real distinction.  I guess my understanding of
the way this business works is that one of the
ways it works is that the pimp basically picks
someone who is going to be his assistant.
That's where you determine.  Pimps can't operate
their whole business without somebody to help
them collect the money, drive the car, their
coercion and terrorizing of that person are no
different than the coercion and terrorizing of
people under them.  You think Ms. McKenzie
because she was smart, she was older, not
because she said I want to be an assistant of
the pimp.  I don't think that's how it works.  I
think in every pimping organization I think
there are other people that know more than I do
including Attorney Patel, including you,
Ms. Font, that you work, they pick somebody and
that person is in the position that's in a
situation.  It doesn't mean they volunteer or
get anything out of it.  As Dr. Cooper said my
client, she herself she experienced battering,
strangulation, substance abuse, facilitated by
Mr. Davis.  She herself was cut and the violence
that is on ongoing that I think is so difficult
for me to understand.  I would guess it is

difficult for the court to understand what being
in that fear and violence every day will allow a
person to do who wouldn't otherwise do this.  I
don't think Ms. McKenzie has ever tried to not
take responsibility for what she did.  I think
at the Polaris Project I think part of her
rehabilitation classes that goes on people have
to understand why they became victims.  I don't
think she's ever tried to walk away from what
she did here.  I think that's clear from her
comments to court.  I think it is troubling
because it is so hard to understand.  That's
where I started.  That's kind of where I still
am.  Reading Dr. Cooper's report assisted me in
trying to understand the psychological picture
of what happens in prostitution.

THE COURT:  Thank you very much.

Attorney Patel.

MS. PATEL:  Yes, your Honor.  I think the
word that I constantly comes to me every time I
think of this case is disconnect.  The
disconnect that goes on when you see the woman
who is here today articulate, intelligent, and
so capable against the acts that bring her
before your Honor today and having thought a

lot, I think about the question that clearly has
come up for which I have no answer either.  I
think she is a very extraordinary person.  She's
a person who comes here as a child raised by a
single mother.  Immigrating which is not an easy
thing to do and she comes into the Bronx.  She
realizes she's going to make it herself through
life.  She becomes a terrific athlete, getting a
full athletic scholarship to St. John's.  She is
hard working.  She really is a very, very
capable individual who achieves at a very high
level to whatever she puts her mind to.  We saw
that in her athletic abilities.  We see that in
her cooperation.  I never had a cooperator who
has done what she has done in a case.  Her
cooperation was so extensive and the two things
that I'm struck by I really do believe because
after what she did, other victims were saved.
The agent were able to find them.

One in particular whose life story is one of
the most difficult I have ever had to hear and
who was brutalized so badly by Mr. Davis.
What's also extraordinary is that manner in
which she's conducted herself since her arrest.
My recollection.  I may be wrong but I do

believe.  When we arrested her, she was still
dancing, not for Mr. Davis but she was dancing,
we arrest, not only does she immediately
cooperate, we talk about a program far away from
her mother.  She agrees to do it.  She did a
fantastic job while at a Polaris Project.  It is
not a minor incident.  It was a very difficult
incident.  It is the incident for which the
government revoked, asked her supervised release
be violated and brought her back up here.  It is
at that time the government decided she would
have to enter into a plea of guilty because of
that and the other very disturbing behavior
while we he recognize all of this extraordinary
ability.  I can't escape what she did for Mr.
Davis was extraordinary, during a
two-year-period of time, she worked very hard.
I think it is all she as a person who is going
to work very hard and achieve a very high level
regardless of what she's doing.  That decision
making process is something of incredible
concern.  Your Honor hit on it.  To do what she
did for the period of time that she did it, I
ask myself there's a period of time she ran away
in Texas and she came back.  I don't know the

psychology of why that happens and I think that
individuals like Ms. Frundt are far more capable
to answer those questions.  She engaged in the
disturbing behavior, very difficult behavior and
criminal behavior.  That's why she's here today.
Those are acts that the government could not
condone.  We could not excuse.  That's why she
took the felony hit.  I guess the concern that I
have going forward for Ms. McKenzie, I clearly
think she lost her morals while she worked him.
She was no longer able to determine right from
wrong during that process.  It may have been
because she was young and very impressionable
and taken into a life that we have come to learn
that's so sick and so twisted and this man has
ruined the lives of so many people including Ms.
McKenzie.

I think the most important thing going
forward given how what a fierce, strong person
she is, I think that it is to put her in a
direction where she's going to be able to use
all of these attributes to be successful if she
does take the right direction and make the right
decisions.  I have no doubt Ms. McKenzie will be
a much better lawyer than myself, a much better

agent than Sean O'Malley. She's someone whose
decision making has to get in the right way. I
don't know how much the therapy has done. I
think quite frankly that's something that needs
to continue. I had not realized it had stopped.
It needs very strongly to continue. In terms of
her punishment, we have asked that any piece of
supervised release include the community service
hours. Although she's currently working with
Ms. Frundt, we would request a formal amount of
time be added to the judgment. About 200 hours
per year for any year on supervised release. I
had reached out to Polaris who is willing to
accept her. The government doesn't want to pick
for her. We would ask that court consider
entering that. She's someone who is unusual and
she has the ability to give back and pay back to
society in a very good way and rescuing,
rehabilitating others who are in this position
as a manner that she has suffered greatly. I
think the facts are fully before your Honor.

I'm certainly happen to answer any
questions, therefore, we defer to your Honor in
terms of imposition of your sentence. I would
thank Probation Officer Zampano for what has

been a very detailed and thorough sentencing
record.  Ms. Owens tremendously hard, and the
last I think I want to say to Ms. McKenzie, all
of us on this side of the aisle really want to
see her succeed.  She's someone who endured so
much.  She's able to overcome and she has
resilience that's extraordinary.  So regardless
of the Court's sentencing, I want her to know
that all of us do want to see her succeed in
life.

THE COURT:  Thank you.  Not so fast.  My
first question there are victims in the case
have.  Have they been notified?  Have they
indicated a desire?

MS. PATEL:  They were all notified.  None
of them have indicated desire.  I think from
talking to them they are very conflicted.  These
are all individuals who saw her as an individual
who was in charge and the right-hand man and the
person who would tell on them.  Some of them
were jealous quite frankly of the position she
occupied.  We go back to the very twisted world.
I think they are very jealous of the attention
she got and the place she occupied with them but
none of them -- I know one in particular thought

about it for a long time but none of them have
wanted to address the court specifically.  Your
Honor asked the question to Attorney Polan about
is she the same type of victim.  I think she's a
victim but a small victim.  I think she is a
victim absolutely.  I don't think she gets to
that level in part because of the organizational
structure of this ridiculous culture.

THE COURT:  One other question did you
purposely refer to supervised release as a way
of disagreeing with Attorney Polan's suggestion
or was that just in artful?

MS. PATEL:  I meant to say probation.
That was inartful on my part.  To the extent
that any period.  We leave it to your Honor that
any time that should be any period of probation
afterwards or in lieu of whatever your Honor
decides, should include a community service and
counseling component is what the government is
asking for.  Should I sit down?

THE COURT:  Sure.  As I indicated
earlier, the Court needs to impose a sentence
here today after consideration of all the
factors identified in the statute.  We have
already discussed the sentencing guideline range

that the 60 month max of the sentence and my
view of whether the original range is really of
no moment in the case at all.

Ms. McKenzie, when called upon to impose a
sentence, it's my obligation to address the need
for any sentence.  We don't in this society
punish people just for the abstract desire to
hurt someone or to punish them.  We do it
because we think we accomplish something.  One
thing we hope to accomplish is promote respect
for the law and the punishment.  The sentence in
effect should reflect the seriousness of the
offense.  Otherwise people won't respect the
law.  People engage in criminal conduct then
aren't punished in a way that bears a
relationship to what she did.  Others will say I
might as well violate the law because I'm not
going to suffer any punishment.  My sentence
today as to address that need.

My sentence has to provide deterrence to
future criminal conduct and protect the public
from further crimes by you unless you are
deterred.  I hope I'm not wrong about this but I
think that those two needs of the sentence are
not very great in your case.  I still have some

concern that you obtain mental health treatment
and continue that until the issues that were
assessed by the psychologist who evaluated you
have been addressed because I do think that -- I
don't want to say this could happen to you
again, but you could make another wrong choice
unless you have help in understanding how you
ended up in this situation, what sort of
psychologically was brought to bear upon you and
what you should do to avoid that happening.  In
other words, avoiding losing control of your
situation.  In this situation you let Mr. Davis
control you.  I'm generally optimistic and don't
view there to be a great need to protect the
public by future crimes by you.  I don't believe
that you are a recidivist, that you will commit
further crime.

Another need for the sentence is to provide
you with the needed care or treatment in the
most effective manner.  As I have already
mentioned, I'm in agreement with the government
that mental health treatment should continue
with periodic assessments of the need to
continue.

The Court also has to address the nature and

circumstances of your offense and your history
and characteristics.  I will start first with
the offense.

Obviously the circumstance of your offense
across in a situation which I think it's fair to
say you were in effect lured into the Davis
environment likely because you felt vulnerable
because you had lost your scholarship money and
wanted to get back to school.  And as I have
agreed with your counsel, you clearly were a
victim at the time.  You were also committing
your offense which is a rather unusual
circumstance, and you were a victim in the sense
of not only being, in effect, prostituted but
also in the sense of physical abuse, threats,
and other psychological terror visited upon you
by Mr. Davis.

However, you did commit an offense.  You
pled guilty.  I found there was a basis for your
guilty plea and indeed your conduct which I
don't think can be excused completely, it may be
can be explained but it can't be excused in our
society by what occurred during or coercion that
you felt you were under.  You were still
responsible for what you did and what you did

was very serious.  While you didn't commit, of
course, as I have said, any sexual act yourself
on any of the victims, you didn't profit from
this.  In fact, Mr. Davis took anything that you
made.  You did become his, in effect, main
person to supervise the other people that he
would lure into his trap.  In some instances,
minors you would instruct them not to tell
others they were minors.  You would tell them
not to tell their true age.  That you
transported them to strip clubs where you knew
they were going to engage in sex acts.  You
arranged for them to travel out of state and to
various other locations Texas, Florida, to
commit sex acts.

On one occasion, you physically assaulted
one of the victims in stabbing that person at
one of the Bridgeport strip clubs.  I have
already spoken and maybe I need to say it
because it was by way of questions to your
counsel, about the fact that given you're a
victim yourself, as I think Dr. Cooper talks in
her report, you were in effect conditioned to be
become a supervisor for Mr. Davis.  But as I
indicated in my questioning which maybe wasn't

very artful or well articulated and perhaps
reflects an enormous ignorance of people who
find themselves in these situations but there
came a time when you did leave.  You did stop
doing what you were doing to help Mr. Davis as
well as stop being his victim.  Your history and
characteristics present an entirely different
picture in many respects.  Your history before
and as you went to university shows you were
very capable.  You achieved a lot in your life.
You were recognized for that.  You are very
bright and hard working.  You have conducted
yourself essentially quite well since you have
been released pretrial and presentencing and
successfully completed the program.  You were
placed into and have, in turn, obtained a very
good job where your employer has very wonderful
things to say about your abilities.  You
volunteered to help others including others who
might find themselves in situations like you
found yourself in.  I mean the only word that I
think describes your world in front of you today
is tragedy.  It is really a tragedy that you
were somehow made a choice to get involved with
Mr. Davis, and I won't repeat what happened

after you did that.  It's a real tragedy.

I credit the government's comments about your resilience.  I can see that in the letters that I have gotten.  You worked very hard since you were arrested and allowed to participate in the program from and after that to really put yourself back on your feet to do what you were able and capable of doing back when you were 20 and lost your scholarship.

In that regard, I don't want to repeat myself but obviously your cooperation was of enormous benefit to the government, and I particularly credit it in two respects and that is your helping the government to identify further victims of Mr. Davis who then could be located and helped and in being willing to be identified as a cooperator and as I said earlier, I think this in many respects lead to Mr. Davis' guilty plea, that avoiding the other victims that include the minor victims from having to testify.

I would ask if you would please rise to I might impose sentence.  It is the sentence of this court to impose upon you a period of probation of five years.  As special condition

of probation, the Court imposes a condition of
mental health treatment either in or outpatient
as determined appropriate in the first instance
by the Probation Office.  The defendant shall
pay all or a portion of the costs associated
with the treatment based upon the defendant's
ability to pay as determined by the Probation
Office, again in the first instance.

Further, the court orders community service
at the rate of 200 hours per year for two years
in a program approved by the Probation Office
before service commences and quarterly reports
of the work towards that 200 hour requirement
shall be provided.

In addition, as a special condition, the
defendant shall not possess a firearm,
ammunition or other danger weapon.

The court imposes the standard conditions of
probation and the following mandatory conditions
that number one, that you not commit another
crime; number two,  -- excuse me, number three,
that you not unlawfully possess a controlled
substance; number five, that you refrain from
any unlawful use of controlled substances and
submit to the three tests provided by this

condition. Number six, excuse me not number six. That number 10, that you cooperate in the collection of a DNA sample.

Further, the court imposes a special assessment of $100 as required by law.

Further, it is my intention to request that supervision not be transferred to Ms. McKenzie to where her present location is but that it remain with me. In other words, the Probation Office in the District of Columbia but it is not meant to transfer the case to a judge in the District of Columbia.

It is my intention to retain supervision at least for a number of years of Ms. McKenzie.

The reason I do that, Ms. McKenzie, is that I made what I view to be one of the most difficult decisions I have had to make. I think a period of imprisonment could very well have been called for in your case. But on balance, the consideration and in some respect, it is delay of what you probably think has been a nightmare of delay of two and a half years, has worked to your advantage because it provided evidence that you have pulled yourself up off the ground, demonstrated that resilience and

evidence that you can be a contributing member
of society and make the right choices.  And it
is certainly my hope I'm not mistaken in that
judgment.  But what you did, the acts committed
on the victims, while they don't come close to
Mr. Davis, are still really very serious acts.
You made other people victims along with him or
you helped them to become victims.  That's why
the decision here today is very difficult.  My
hope is that your probationary period of
supervision will see you go from one success to
another.  But if it didn't, if you make the
wrong choices, please understand that and if any
of those choices involve violations of my
conditions of probation, that you will then be
required to come back and see me.  It is my hope
I don't see you again, no offense, but that's my
hope because if I did, it would mean I made the
wrong judgment here today which, as I say, was a
very close call for me but I think I made the
right one.  And if I don't see you again, it
will mean that I did.

I believe there was a waiver of appeal.
Sorry.  It's a long time ago so I don't remember.

MS. PATEL:  There was up to six months of

incarceration.

THE COURT:  You would normally have the right to appeal this sentence but in your Plea Agreement, you agreed if the sentence was less than six months of imprisonment, you would give up your right to appeal.  Obviously it is less than that.  I don't think you have a right to appeal.  If for some reason you wanted to appeal and you thought you had a right to appeal, you can try to do that.

Attorney Polan, if you ask her, must file a Notice of Appeal.  She doesn't have to help you later on but she has to file a notice.  Assume you decide tomorrow and you can't locate her or reach her by phone, you can file your own Notice of Appeal.  It says USA versus Shamere McKenzie. I appeal my sentence and sign your name.

However, it's important that you understand that that notice has to be in the Clerk's Office within 10 days of today.   It's a very short period of time.  If it is not there by then, you can't try to appeal.

Do you understand that very short time limit?

THE DEFENDANT:  Yes, ma'am.

1          THE COURT:  Is there anything else the

2  court has to take up?  Counts to be dismissed?

3          MS. PATEL:  I believe she was only named

4  in the conspiracy counts.  That's the only one.

5          I do have two cooperation agreements.

6  They are both under seal.  March 14 and August

7  21 of 2007.  I can hand those up to the clerk to

8  be filed.

9          THE COURT:  I don't think they need to be

10  filed under seal now.

11          MS. PATEL:  May I approach?

12          THE COURT:  Yes, please.

13          MS. PATEL:  (Handing.)

14          THE COURT:  I have been handed up the

15  original of the signed Plea Agreement dated

16  March 14, 2007, and the original of a second

17  letter August 21, 2007, again signed by both

18  counsel and the defendant.  The first one is

19  four pages to the signature of Attorney Patel

20  and is the second one.  Both of those can be

21  docketed, placed upon the docket in the case.

22  Is there anything further?

23          MS. POLAN:  I had a clarification.  I

24  don't think it was your Honor's intention with

25  respect to probation supervision, I don't think

it was your intention she would have to live in the District of Connecticut. I'm trying to get some clarification of that.

THE COURT: She can reside wherever the Probation Officer says and where she is she can stay there. All my intention is that sometime when a defendant locates outside of Connecticut, they will ask the court to transfer the case, not supervision but the case to the court where they are located so that if there's a violation, the judge in that court would handle the violation, not me. And I wanted it clear to the Probation Officer unless he hears something really strong out of the district where she's now or where she might be in the future, they want the case, it is my intention to keep the case with me. Supervision will be where she's located wherever the Probation Officer authorizes her to locate.

MS. POLAN: I understood your intention the way you first said it. It sounded like you wanted her supervised in Connecticut which I don't think it was your intention.

THE COURT: At the end of the day, it is in front of me. As far as the Probation

Officer, I don't expect our Probation Officer to
be supervising her.  I expect an officer where
she lives to be supervising her.  If there are
any violations that that officer wishes to
report, it would come to me; not to a judge in
that district.

MS. POLAN:  I'm hopeful that will never
happen, Judge.

MS. PATEL:  This is an unusual request.
Is it possible to have certain documents filed
and not uploaded onto ECF?

THE COURT:  I don't think I can do that.
I think the Egovernment.  It has to be under
seal.  If they are voluminous, they don't get up
loaded but I don't think anything in this case
fits into that category.  So I think everything
in this case will get uploaded.

MS. POLAN:  Your Honor, I was discussing
with Attorney Patel, I have some safety concerns
about my client and about any information.

THE COURT:  I don't know whom you would
be concerned about other than the two defendants
who are already very well aware of what's in
those agreements and in the motion.  I
understand the desire not to be on the Internet

but Congress has indicated -- not indicated.
Let me strike that.  Congress has made it the
law that unless I can justify sealing,
everything is available.  I mean they are
working on changing that but it hasn't been
changed yet.  You are free to make an argument.
I don't yet see an argument that justifies
sealing the document.

MS. PATEL:  My concern more the fact that
it could be so easily Googled, and she will be
on the Internet.  I'm less concerned about the
physical safety threat at this point.  It is
something that news in this case.  In light, do
I think we can overcome sealing it, no.  Not
sealing it in light of what's already become
public.

THE COURT:  Under Criminal Rule of
Procedure 49.1E, I can for good cause order in a
case, limit to prohibit a known party's remote
access to a document file with the court.  Would
you make an application under that rule?  It's
subcaptioned a protective order.

MS. PATEL:  What I would do is ask that
the 5K motion, the two cooperation agreements,
and quite frankly Attorney Polan's sentencing

1    memo.

2            THE COURT:  These already been docketed.

3            MS. POLAN:  What I would ask is I have

4    seen things docketed and changed the status.

5            THE COURT:  They can be taken back down.

6    The problem is they have been uploaded to PACER.

7    There's no way to grab them back.  The

8    government has some experience with that.

9            MS. POLAN:  I ask that attachments to the

10   documents I filed I believe on the 22nd and

11   today, I would move under that same provision.

12   There's a supplement and a second supplement

13   sentencing memo.  It is the attachments that I

14   have some concerns about.  Not the document, the

15   attachments to it.

16           THE COURT:  Those I would.

17           MS. PATEL:  I think the psychiatric

18   report can be sealed.

19           MS. POLAN:  That's not the issue.

20   There's documents that were attached that I

21   filed.

22           THE COURT:  There's transcripts.  There's

23   a letter from her employer.

24           MS. PATEL:  Then transcripts from

25   Maryland.

1       THE COURT:  Supplemental memo is letters

2  of support or are you claiming those as well?

3       MS. POLAN:  Yes.  There's one from the

4  Polaris Project.

5       THE COURT:  How about I hold -- well,

6  have you already filed those?

7       MS. POLAN: Yes, your Honor.  I filed

8  them -- I filed one on Friday and one today.

9       THE COURT:  If it is today, we can take

10  it down until I address the issue.  Today was

11  the second supplemental memo, right, so, Bern,

12  would you cause that to be redocketed before

13  5:00 today please, and then I would ask if

14  counsel would confer and make a motion under

15  49.1 maybe after you had a chance to look at any

16  cases that might suggest how broad good cause is

17  and identify exactly what you want under seal,

18  and we will hold onto these filings for a short

19  period of time until I can receive that and make

20  a ruling.

21       THE PROBATION OFFICER:  Did the court

22  make a finding in terms of the fine?

23       THE COURT:  Based on the representations

24  of counsel, the Court finds that the defendant

25  does not have a capacity to pay a fine and no

1    fine will be ordered.  Thank you.

2         THE PROBATION OFFICER:  For

3    clarification, you ordered 200 hours of

4    community service for two years.  Did your Honor

5    want to start that immediately or is there a

6    time frame when your Honor would like that to

7    start?

8         THE COURT:  30 days from today.  She has

9    on consult with our probation officer,

10   identified a project that will take her and set

11   it up so 30 days from today.

12        I do want to thank you for an excellent

13   report as well and your help in the case.

14   Anything further?  No.  We'll stand in recess.

15     (Whereupon, the above hearing adjourned at

16   04:11 p.m.)

17

18

19

20

21

22

23

24

25

COURT REPORTER'S TRANSCRIPT CERTIFICATE

I hereby certify that the within and foregoing is a true and correct transcript taken from the proceedings in the above-entitled matter.


/s/  Terri Fidanza

Terri Fidanza, RPR

Official Court Reporter